## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Mark Filip | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 638 | **DATE** | 8/30/2004 |
| **CASE TITLE** | First American Commercial Bancorp vs. Interior Architects, Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: the Court grants Plaintiff's motion for summary judgment on Counts I and III of its complaint. Defendant's counterclaim seeking declaratory judgment is dismissed. Status hearing set for 9/20/04 at 9:30a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | **Document Number** |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | AUG 31 2004 | |
| | Notified counsel by telephone. | date docketed | 30 |
| ✓ | Docketing to mail notices. | | |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| TBK | courtroom deputy's initials | date mailed notice | |

U.S. DISTRICT COURT
CLERK
2004 AUG 30 PM 3: 28
FILED U.S.A.
Date/time received in central Clerk's Office

mailing deputy initials

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FIRST AMERICAN COMMERCIAL )
BANCORP, INC. d/b/a FIRST AMERICAN )
EQUIPMENT FINANCE, )
                             )
         Plaintiff, )
           v. )
                             )
                             )
INTERIOR ARCHITECTS, INC., )
                             )
         Defendant. )

DOCKETED

AUG 3 1 2004

No. 03 CV 00638

Judge Mark Filip

Magistrate Judge Mason

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff, First American Commercial Bancorp, Inc., doing business as First American

Equipment Finance ("Plaintiff" or "FAEF"), has filed a three-count complaint against Defendant

Interior Architects, Inc. ("Defendant" or "IA"). In count I of its complaint, Plaintiff claims that

IA breached a sale-leaseback agreement requiring IA to (a) return the equipment at the end of the

lease term; (b) pay rent on the equipment at a contractually agreed extended-term rate, which

became effective after the presumptive expiration of the lease term; or (c) purchase the

equipment at fair market value. In count III, Plaintiff asserts a claim for conversion, because IA

has never returned the leased equipment to FAEF, purchased it, or paid any extended-term rent.

Plaintiff seeks return of its equipment plus damages, including extended-term rent under the

contract that accrued after the expiration of the presumptive lease term. Defendant, in turn,

counterclaims against FAEF, seeking a declaratory judgment that an unsigned facsimile

concerning the sale-leaseback agreement capped the fair market value purchase price of the

equipment at 20% of the original purchase price.



Before the Court is Plaintiff's motion for summary judgment on counts I and III of its complaint.[1] For the reasons set forth below, Plaintiff's motion is granted.

## I.   FACTS[2]

IA, a California corporation with its principal place of business in California, provides design services to major corporations. (Plaintiff's Local Rule 56.1(a)(3) Statement of Facts ("Pl. SF") ¶¶ 3-4.) FAEF, an equipment leasing company, is incorporated in Illinois and has its principal place of business in Chicago. (*Id.* ¶¶ 1-2.)

Beginning in 1998, the parties engaged in various sale-leaseback transactions involving computer hardware and software, phone equipment, furniture and fixtures, and other miscellaneous equipment. (*Id.* ¶ 8; Defendant's Local Rule 56.1(b)(3)(B) Statement of Additional Facts ("Def. SAF") ¶ 1.) Sale-leaseback transactions offer a number of advantages to a lessee such as Defendant: (1) non-productive assets, such as computers and software, remain off the lessee's balance sheet; (2) the lessee may deduct the lease payments immediately as opposed to depreciating the equipment over longer periods of time than the lease term; and (3) at the end of the lease, the lessee may return or purchase the equipment. (Pl. SF ¶ 16.)

In these sale-leaseback transactions, Defendant purchased equipment, sold it to Plaintiff, and then leased it back from Plaintiff for a period of three years. (*Id.* ¶ 9.) At the end of the three-year term, Defendant had the option to return the equipment to Plaintiff, to buy the equipment from Plaintiff at its fair market value, or extend the lease and pay rent according to

---

[1]  Count II has previously been resolved and is not before the Court.

[2]  The Court takes the relevant facts from the parties' Local Rule 56.1 statements and exhibits. The Court resolves any factual ambiguities in favor of IA, the non-movant. *See Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

contractually agreed extended-term rates. (*Id.*; D.E. 9 ¶ 14.)

The events giving rise to the case at bar began in early 1998, when the parties initiated negotiations leading up to the sale-leaseback agreement. Frank Sommers ("Sommers"), then senior account officer of FAEF, and Joseph McClelland ("McClelland"), then IA's controller, conducted a series of telephone negotiations in which they discussed IA's current leasing deals and the possibility of IA dealing with FAEF. (Def. SAF ¶¶ 1-2, 5.) According to IA, McClelland viewed Sommers as his sole point of contact at FAEF. (*Id.* ¶ 3.) On June 10, 1998, Sommers sent McClelland a letter summarizing a proposed equipment lease between FAEF and IA. (*Id.* ¶ 5; Pl. Ex. 8.) This letter included language stating:

> This proposal is an expression by Lessor [Plaintiff] of its interest in considering a lease transaction on the general terms and conditions outlined above. THIS LETTER IS NOT, AND IS NOT TO BE CONSTRUED AS, A COMMITMENT BY THE LESSOR TO ENTER INTO THE PROPOSED LEASE TRANSACTION. Lessor shall not be obligated to provide any lease financing until the satisfactory completion of its due diligence, the receipt of all requisite approvals by Lessor's management, and the prior execution and delivery of final legal documentation in form and substance acceptable to all parties, including acceptance of the Equipment by the Lessee.

(*Id.*, Pl. Ex. 8.) (capitalization in original). McClelland signed and returned the proposal on June 15, 1998. (Def. SAF ¶ 5; Pl. Ex. 8.) It is undisputed that Sommers did not get the approval of anyone at FAEF to send the non-binding proposal to McClelland. (Def. SAF ¶ 6.)

In July, 1998, Sophie Shive ("Shive"), a financial administrator for FAEF, sent to McClelland unsigned copies of a proposed master lease ("Master Lease"), Equipment Schedules No. 1 and 2, and other related lease documents for review and execution on behalf of IA. (Pl. SF ¶¶ 19, 23.) The Master Lease set forth the following language addressing sale-leaseback provisions:

> Lessee [Defendant] hereby leases from Lessor [Plaintiff] the hardware, software and/or other personal property (the "Equipment") listed on such Equipment Schedules executed from time to time pursuant to this Master Lease. Each Equipment Schedule shall incorporate all of the terms and conditions of this Master Lease, and shall contain such additional terms and conditions as Lessor and Lessee agree, and shall constitute a separate lease obligation of Lessee (the "Lease").

(Pl. Ex. 5, Tab 1 at IA 00001 ¶ 1.)

Although the exact timing is unclear, McClelland, upon receiving the documents from Plaintiff, discovered that the documents did not address two issues: sales tax concerns and the end of term provision providing that one of Defendant's options at the end of the presumptive lease term was to buy the equipment for fair market value (Def. SAF ¶ 14)—referred to by both parties throughout the briefing as the "FMV provision" and/or "FMV Addendum." McClelland then called Sommers, who assured McClelland that he would send the appropriate documents. (*Id.* ¶ 15.) It is undisputed that on July 14, 1998, Bill Verhelle ("Verhelle"), Plaintiff's chief executive officer and director of credit & operations, faxed to McClelland an unsigned copy of an addendum to the Master Lease that detailed Defendant's fair market value purchase option ("the FMV Addendum"). (*Id.* ¶ 21.) The FMV Addendum contained the following language:

> Upon Lessee's satisfaction of all rental and all other obligations required under the Agreement, provided that no Event of Default has occurred or is continuing and provided that Lessor receives proper advance written notice from Lessee as required under the agreement, Lessee may purchase all but not less than all of the Equipment from Lessor for its then *fair market value*.

(Pl. Ex. 5, Tab 2 at IA 00005 (emphasis added).) Verhelle also informed McClelland that "[t]he standard end-of-term purchase option for all [of Plaintiff's] transactions that do not specify otherwise . . . is Fair Market Value. . . . If you desire, please execute and return the attached Addendum with the other items of paperwork." (Pl. SF ¶ 21.) In addition, Verhelle invited

4

McClelland to "[p]lease feel free to call with any questions." (*Id.*)

It is undisputed that McClelland understood that, if he and Verhelle executed the FMV Addendum on behalf of their respective companies, the FMV Addendum would be supplemental to and made a part of the Master Lease. (*Id.* ¶ 22.) The parties dispute what happened next, however. According to Defendant's version of events, McClelland called Sommers (but not Verhelle) to discuss the FMV Addendum. (Def. SAF ¶ 17.) During the conversations—which took place sometime between July 14 and July 28, 1998—McClelland informed Sommers that he considered the language in the FMV Addendum to be vague and not in conformity with their earlier negotiations in June 1998. (*Id.* ¶ 18.) In response, Sommers assured McClelland that his clients never paid more than 15-20% of the original purchase price. (*Id.* ¶ 19.) Despite this assurance, McClelland requested that Sommers supply documentation to that effect, or McClelland would not sign either the Master Lease or the FMV Addendum on behalf of Defendant. (*Id.* ¶ 20.) FAEF disputes that these conversations occurred—at least in the form related by Defendant. (Pl. Resp. to Def. SAF ¶¶ 17-20.)

Defendant further asserts that on August 3, 1998, Sommers faxed McClelland a single-page unsigned facsimile containing the following text: "This side letter is to address the end of term option. If the lease goes to the end of term, Interior Architects will pay no more than 20% of the original cost at the end of thirty-six months." (Def. SAF ¶ 21; Pl. Ex. 42.) This unsigned facsimile ("Side Letter" or "unsigned facsimile") was typed on a blank sheet of paper, not FAEF letterhead, and contained no other information. (Pl. Ex. 42; Pl. SF ¶¶ 67-70.) Although Plaintiff disputes that Sommers sent the Side Letter, it is undisputed that Defendant received the fax and that the fax originated from a fax machine to which only Plaintiff's employees had access. (Def.

SAF ¶¶ 21-23.)

At any rate, on August 6, 1998, McClelland signed and executed the Master Lease and

FMV Addendum.[3] (*Id.* ¶ 25.) Defendant does not dispute that before McClelland executed the

Master Lease, he read the following language appearing immediately above the signature lines of

the Master Lease:

- "THIS LEASE AND THE APPLICABLE EQUIPMENT SCHEDULE(S) CONTAIN THE ENTIRE AGREEMENT BETWEEN LESSOR AND LESSEE WITH RESPECT TO THE SUBJECT MATTER THEREOF."

- "THE LEASE CAN ONLY BE MODIFIED IN WRITING, WITH SUCH MODIFICATION SIGNED BY A PERSON AUTHORIZED TO SIGN AGREEMENTS ON BEHALF OF LESSEE AND BY AN AUTHORIZED SIGNER OF LESSOR."

- "NO ORAL OR OTHER WRITTEN AGREEMENTS, REPRESENTATIONS, OR PROMISES SHALL BE RELIED UPON BY, OR BE BINDING ON, THE PARTIES UNLESS MADE A PART OF THIS LEASE BY A WRITTEN MODIFICATION SIGNED BY AN AUTHORIZED SIGNER OF LESSEE AND LESSOR."

(Pl. SF ¶ 24 (all capitalization in original; bullet points added for ease of reading).) By the

express terms of the Master Lease, these documents constituted a "firm offer" from Defendant to

Plaintiff. (Pl. Ex. 5, Tab 1 at IA 0004 ("Until an authorized signer of Lessor has signed this

lease, it will constitute a firm offer by Lessee.").)

McClellan then returned the signed documents, but not a copy of the unsigned facsimile,

to Verhelle at FAEF. (Pl. SF ¶ 25, 73-74.) Despite this omission, Defendant claims that it was

McClelland's understanding that the unsigned facsimile was supplemental to and a part of the

FMV Addendum and the Master Lease. (Def. SAF ¶ 27.) After reviewing the documents,

---

[3] The signed documents are dated July 2, 1998, and July 3, 1998, respectively, but it is undisputed that McClelland actually signed the documents on August 6, 1998. (Def. SAF ¶ 25.)

6

Verhelle signed the documents on behalf of Plaintiff, thereby accepting Defendant's offer and executing the lease agreement ("the Agreement"). (Pl. SF ¶ 28.) Verhelle then caused Plaintiff to send copies of the fully executed documents to Defendant for its files. (*Id.*)

From August 6, 1998, through August 16, 2001, FAEF and IA signed Equipment Schedules No. 1 to 17 and associated documents in accordance with the Agreement. (Pl. SF ¶¶ 29-43.) It is undisputed that there is no reference to, nor mention of, the unsigned facsimile in the Master Lease, the FMV Addendum, any of Equipment Schedules No. 1 through No. 17, or in any related lease documents that Plaintiff and Defendant exchanged and executed during the numerous transactions leading to this lawsuit. (*Id.* ¶ 74.) At no time during the negotiation and execution of these schedules and related lease documents did McClelland provide to Plaintiff a copy of the unsigned facsimile, nor did McClellan ever refer to it or advise anyone at FAEF of its existence. (*Id.*)

As the lease terms for equipment initially ended under various schedules, Defendant chose to begin purchasing equipment. At first, the parties' arrangement ran smoothly. In May, 2001, Defendant purchased the items listed in Equipment Schedules No. 1 to No. 3 (at the end of the respective lease terms) for $66,180.29—an amount equal to 16.7% of the sum of the original purchase prices for the relevant equipment. (Pl. Resp. to Def. SAF ¶ 44; Pl. Ex. E.)

On August 13, 2001, Tracey Sherwood, an FAEF employee who was quoting Fair Market Value prices to IA, offered to sell Defendant the equipment listed in Equipment Schedules No. 4 and 5 at the end of their lease terms for $42,875.05 and $38,156.25, respectively. (Pl. SF ¶ 44.) McClelland, on behalf of Defendant, countered by telling Sherwood that "based on [his] calculations, a reasonable price [for the equipment listed in Equipment Schedule No. 4] would

7

appear to be $37,348.44," an amount equal to 22.36% of the equipment's original purchase price. (*Id.* ¶ 45.) In support of this price figure, McClelland sent Sherwood a spreadsheet containing his calculations and labeling his proposed figures as "Total Estimated Value" and "Estimated FMV." (Pl. Ex. 36 at FAEF 10049-50.) Following further negotiations with Sherwood, McClelland agreed to purchase the items in Equipment Schedule No. 4 for $40,875.05, or 24.47% of the original purchase price. (Pl. SF ¶ 47.)

As to Equipment Schedule No. 5, McClelland stated that, in Defendant's view, the "Total Estimated Value" or "Estimated FMV" of equipment under that schedule was $34,853.22—or about 24.22% of the original purchase price. (*Id.* ¶ 48.) Again, following further negotiations with Sherwood, Defendant, through McClelland, agreed to purchase the Equipment Schedule No. 5 items for $36,156.25, or 25.12% of the original purchase price. (*Id.* ¶ 50.)

The parties' troubles began the following year. On May 7, 2002, as Equipment Schedule No. 6 approached the end of its lease term, Sherwood offered to sell the listed items to Defendant for $47,723.64. (Pl. SF ¶ 51.) It took McClelland almost a month to respond, and he did so by sending Sherwood a spreadsheet calculating the "Buy-out amount" at $28,648.49, which was 20.8% of the original purchase price. (*Id.* ¶ 52.) In late June 2002, Sherwood came down to $43,000 and advised McClelland that she would be unable to get close to the figure that Defendant proposed. (*Id.* ¶ 53.) By early July 2002, Defendant had not responded to Sherwood's latest price quote, returned the items listed in Equipment Schedule No. 6 to Plaintiff, or paid the monthly extended-term rent on the items that was called for under the contractual documents. (*Id.* ¶ 54.) Accordingly, on July 17, 2002, Plaintiff issued Defendant a notice of default under the Master Lease and Equipment Schedule No. 6. (*Id.* ¶ 55.)

The parties' failure to agree on a price for Equipment Schedule No. 6 precipitated discussions between McClelland and Verhelle. (Def. SAF ¶ 46.) In these discussions, McClelland mentioned the unsigned facsimile and its language purportedly capping the purchase price at 20%. (*Id.*) It is undisputed that Verhelle told McClelland that he would never have signed the Agreement on Plaintiff's behalf had IA informed him of the Side Letter's existence or had taken the position that the Side Letter would apply to any sale-leaseback transactions between the parties. (Pl. SF ¶ 77.)

On July 29, 2002, McClelland forwarded a copy of the Side Letter to Michael Ziegelmann, FAEF's chief financial officer. (Pl. SF ¶ 56.) After Verhelle received the Side Letter, Verhelle and McClelland had further discussions concerning their dispute.[4] Following these discussions—and despite his invocation of the Side Letter—McClelland, after conferring with Defendant's legal counsel, agreed to purchase the items on Equipment Schedule No. 6 for $35,824, an amount equal to approximately 26.05% of the original purchase price. (*Id.* ¶ 59.)

In December 2002, as Equipment Schedule No. 7 approached its end of term, Sherwood offered to sell the listed equipment to Defendant for about $63,500.00, or about 27.5% of the original purchase price. (*Id.* ¶ 60.) In response, McClelland advised Sherwood that Defendant would not pay more than 20% of the original purchase price, because

> [the Side Letter] was provided to IA prior to our signing the Master Lease Agreement, [and] our legal counsel feels confident that this document would prevail in the appropriate legal forum. Based upon the opinion of our counsel, I

---

[4] It is undisputed that Verhelle told McClelland that, *inter alia*, (1) the Side Letter was not executed by anyone—much less by an "authorized signer" for FAEF as the Master Lease required; (2) Sommers was not an "authorized signer" for FAEF; and (3) FAEF did not, and would not, consider the Side Letter to be part of the Master Lease, which contains an integration clause. (Pl. SF ¶ 57.)

am unwilling to pay in excess of 20% for any of the remaining schedules.

(*Id.* ¶ 61.) Sherwood advised McClelland that Plaintiff would not sell the Equipment Schedule No. 7 items for 20%, and, in the absence of any agreement on a sales price or extension of the lease term, requested that Defendant return the equipment to Plaintiff. (*Id.* ¶ 62.)

To date, Defendant has refused to return the equipment listed in Equipment Schedule No. 7, maintaining that the parties had agreed that Defendant could purchase the equipment for no more than 20% of the original purchase price. (Pl. SF ¶ 63.) In addition, Defendant has not paid any rental fees, sales or use taxes, or late fees in connection with the equipment in Schedule No. 7. (*Id.* ¶ 65.)

This lawsuit followed. Plaintiff alleges breach of contract and conversion on the part of IA and seeks overdue rent payments, taxes (which Plaintiff apparently has been required to pay, notwithstanding that Defendant has retained the equipment and has not paid any rent), and other damages. (D.E. 1; D.E. 28 at 2.) Plaintiff also seeks return of the equipment listed in Equipment Schedule No. 7, plus attorney fees as provided in the Agreement. (D.E. 1; D.E. 28 at 2.) Defendant's counterclaim seeks a declaratory judgment that the Agreement, as modified by the Side Letter, caps the purchase price at no more than 20% of the original purchase price for Equipment Schedule No. 7 and all remaining schedules. (D.E. 9; D.E. 28 at 2.) Furthermore, Defendant asserts that it need not return the equipment listed on Equipment Schedule No. 7 because Plaintiff breached its contractual obligation to offer to sell the equipment at "fair market value." (Def. Mem. at 7-8.)

## II. JURISDICTION, VENUE, AND CHOICE OF LAW

The Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because

FAEF and IA are citizens of different states and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs. Venue in this District is proper under 28 U.S.C. § 1391.

With respect to choice of law, the parties in this case have agreed—expressly in the Master Lease, and implicitly throughout their summary judgment briefs—that Illinois law controls disposition of this dispute. (Pl. Ex. 5, Tab 1 at IA 0003.) The Court will therefore apply Illinois law in interpreting the Agreement and the matters at issue. *See McFarland v. Gen. Am. Life Ins. Co.*, 149 F.3d 583, 586 (7th Cir. 1998) ("[I]n situations like the one before us in which parties do not dispute that the forum state's law controls . . . we need not investigate whether another forum's law would be more appropriate."); *accord, e.g., Wood v. Mid-Valley Inc.*, 942 F.2d 425, 426-27 (7th Cir. 1991).

## III.   SUMMARY JUDGMENT STANDARD

Summary judgment is proper where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists for trial when a reasonable jury could return a verdict for the party opposing summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 931 (7th Cir. 1995). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). To avoid summary judgment, the nonmoving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250.

11

Cases involving the interpretation of contractual documents are often well suited to disposition on summary judgment. *See Neuma, Inc. v. AMP. Inc.*, 259 F.3d 864, 871 (7th Cir. 2001); *Grun v. Pneumo Abex Corp.*, 163 F.3d 411, 419 (7th Cir. 1998); *see also Premier Title Co. v. Donahue*, 765 N.E.2d 513, 516 (Ill. App. 2002) ("The interpretation of a contract is a question of law and therefore may properly be decided on a motion for summary judgment.").

## IV. DISCUSSION

Plaintiff argues that it is entitled to summary judgment because Defendant breached the Agreement concerning the equipment related to Schedule No. 7. (Pl. Mem. at 1-2.) In addition, and relatedly, Plaintiff claims that Defendant, which retained possession of the equipment related to Schedule 7 at the end of the presumptive lease term, has committed conversion. (Defendant indisputably has not paid any rent for the equipment, as Plaintiff contends was required under the extended-lease rent terms in the Agreement if Defendant wanted to keep the equipment but not purchase it.) In support of its argument, Plaintiff argues that Defendant is barred from enforcing the unsigned facsimile as part of the Agreement because it (1) merged into the Master Lease, (2) does not comply with the Master Lease's terms barring oral or unsigned modifications, and (3) is barred by the Illinois Credit Agreement Act. (*Id.* at 1-2.) Plaintiff also contends that even if the Side Letter was signed by both parties (it is signed by neither), that Sommers would have lacked authority to execute or amend the Master Lease on behalf of Plaintiff. (*Id.*)

In response, Defendant argues that summary judgment is not appropriate for two reasons. First, Defendant argues that whether the unsigned facsimile is an enforceable part of the Master Lease and the FMV Addendum raises questions of fact that are inappropriate for resolution via summary judgment. (Def. Mem. at 1.) With respect to this argument, Defendant contends that

factual questions exist regarding whether (1) the facsimile modified the parties' Agreement, (2) the facsimile is incorporated into the final Agreement, and (3) the facsimile provides evidence on an ambiguous term in the Agreement (*i.e.*, "fair market value"). (*Id.* at 9.) Defendant also asserts that Plaintiff cannot show that it has fulfilled its obligations under the Master Lease because Defendant disputes whether Plaintiff offered to sell the equipment related to Schedule No. 7 for a fair market price.

      1.      Interpretation Of The Master Lease Agreement

The parties do not appear to dispute that the Agreement is a valid contract. In this regard, FAEF asserts that "under the UCC, 'in order for a [lease] contract to come into being, there must be a meeting of the minds of the parties to the contract.'" (Pl. Mem. at 6 (collecting authorities and quoting *Euclid Eng'g Corp. v. Ill. Power Co.*, 223 N.E.2d 409, 413 (Ill. App. 1967)).) Plaintiff also asserts that "'[i]t is essential that both parties assent to the same thing in the same sense and that their minds meet on the essential terms and conditions." *Id.* (quoting *Euclid Eng'g Corp.*, 223 N.E.2d at 413). Defendant does not dispute either of these propositions, although it makes other objections discussed below.

The interpretation of a contract is a question of law. *See, e.g., Fla. E. Coast Ry. Co. v. CSX Transp., Inc.*, 42 F.3d 1125, 1128 (7th Cir. 1994). Under Illinois law, it is well settled that a court, when construing a contract, should ascertain the intent of the parties and give effect to that intent. *Eichengreen v. Rollins, Inc.*, 757 N.E.2d 952, 956 (Ill. App. 2001) (citation omitted). Furthermore, as the Illinois Supreme Court has explained,

> [t]raditional contract interpretation principles in Illinois require that an agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed

must be determined from the language used. It is not to be changed by extrinsic evidence.

*Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 884 (Ill. 1999) (citation, internal quotation marks, and alterations omitted). This principle of interpretation is also known as the "four corners rule." *See id.* In applying the "four corners rule," a court initially looks to the language of a contract alone. *See id.*[5]

This rule has been described as related (although not identical) to the parol evidence rule. *Eichengreen*, 757 N.E.2d at 956 (citing *Coplay Cement Co. v. Willis & Paul Group*, 983 F.2d 1435, 1438 (7th Cir. 1993)). The parol evidence rule "generally forbids the use in evidence of a prior or contemporaneous agreement or terms not included" in an integrated contract. *Brooklyn Bagel Boys, Inc. v. Earthgrains, Inc.*, 212 F.3d 373, 380 (7th Cir. 2000). "As a further constraint on the consideration of this evidence, the Illinois Commercial Code only allows extrinsic evidence including course of performance, course of dealing, and usage of trade to be considered when it is reasonably consistent with the express terms of the contract." *Id.* (citing, *inter alia*, 810 ILCS § 5/2-202 (Illinois UCC section dealing with leases)). In this respect, Section 2A-202 of the UCC, as adopted by Illinois, states the following with respect to lease agreements:

§2A-202. Final written expression; parol or extrinsic evidence. Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of

---

[5] As the Seventh Circuit has explained, it is sometimes proper for a court thereafter to look to objective extrinsic evidence—even if the contractual language appears clear—to see if there is extrinsic ambiguity concerning the parties' apparent agreement. *See generally, e.g.*, *PMC v. Sherwin-Williams Co.*, 151 F.3d 610, 614-15 (7th Cir. 1998). As discussed further below, this inquiry is not helpful to Defendant, because the parties' objective course of dealing confirms the apparent textual meaning of the Agreement (*i.e.*, that there was no 20% cap on Fair Market Value), as Defendant itself repeatedly suggested post-lease purchase prices in excess of 20%.

their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented:

(a) by course of dealing or usage of trade or by course of performance; and

(b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

810 ILCS 5/2A-202 (West 2004).

### a. The Agreement Is An Integrated Contract

As a threshold matter, the Court must determine whether the writing in question is integrated. *See, e.g., Calvin v. The Leitner Thomas Group*, No. 00-C-8055, 2003 WL 1720008, at *4 (N.D. Ill. Mar. 31, 2003) (citation omitted). Whether a contract is completely integrated is a question of law. *See id.* "Written contracts are presumptively complete in and of themselves; when merger clauses are present, this presumption is even stronger." *Bock v. Computer Assocs. Int'l*, 257 F.3d 700, 707 (7th Cir. 2001) (collecting cases); *accord, e.g., Rosenblum v. Travelbyus.com, Ltd.*, 299 F.3d 657, 665 (7th Cir. 2002) ("The presence of a merger clause is strong evidence that the parties intended the writing to be the complete and exclusive agreement between them") (internal quotation marks and citation omitted). Integration is of special importance under the "four corners" rule, because as the Illinois Supreme Court observed, "where parties formally include an integration clause in their contract, they are explicitly manifesting their intention to protect themselves against misinterpretations which might arise from extrinsic evidence." *Chicago Messenger Serv., Inc. v. Nextel Communications, Inc.*, No. 01-C-8820, 2003 WL 22225619, at *5 (N.D. Ill. Sep. 24, 2003) (citing *Air Safety*, 706 N.E.2d at 885).

In the present case, Plaintiff argues that this language in the Master Lease constitutes an integration clause:

> THIS LEASE AND THE APPLICABLE EQUIPMENT SCHEDULE(S)
> CONTAIN THE ENTIRE AGREEMENT BETWEEN LESSOR AND LESSEE
> WITH RESPECT TO THE SUBJECT MATTER HEREOF.

(Pl. Mem. at 9; Pl. SF ¶ 24 (capitalization in original).) The Court agrees that this language constitutes an integration clause upon which the parties agreed in the signed Master Lease. *See, e.g., Brooklyn Bagel Boys, Inc.*, 212 F.3d at 380 (noting that a clause stating that the contract "constitutes the entire agreement of the parties" was an integration clause).

The presence of an integration clause "is a clear indication that the parties desire the contract [to] be interpreted solely according to the language used in the final agreement." *Air Safety*, 706 N.E.2d at 886. In this case, the parties expressly made the FMV Addendum a part of the Agreement, thus the integration clause encompasses the FMV Addendum, as well. (Pl. Ex. 5, Tab 2 at IA 0005; Pl. SF ¶ 22.) In contrast, the unsigned facsimile upon which Defendant would seek to rely is nowhere referenced in the Master Lease, the FMV Addendum, nor in the seventeen equipment schedules that the parties negotiated over the course of their relationship. (Pl. SF ¶ 76.) In addition, when Defendant returned its signed documents to Plaintiff as its "firm offer" to contract, Defendant never included the Side Letter or even referenced it, notwithstanding that Defendant concedes that it read the provision in the Master Lease immediately above the signature line expressly providing that "NO ORAL OR OTHER WRITTEN AGREEMENTS, REPRESENTATIONS, OR PROMISES SHALL BE RELIED UPON BY, OR BE BINDING ON, THE PARTIES UNLESS MADE A PART OF THIS LEASE BY A WRITTEN MODIFICATION SIGNED BY AN AUTHORIZED SIGNER OF LESSEE

16

AND LESSOR." (Pl. SF ¶ 24 (capitalization in original).) In this regard, Defendant also never voiced any objection when Plaintiff returned only the signed copies of the documents that were included along with the "firm offer." All of these reasons lead, particularly when taken together, to the conclusion that the Master Lease, FMV Addendum, and Equipment Schedules were integrated documents, and that the Side Letter was not among them.

The FMV Addendum, in relevant part, provides simply that "[IA] may purchase all but not less than all of the Equipment from [FAEF] for its then fair market value." (Pl. Ex. 5, Tab 2 at IA 00005.) Neither the FMV Addendum nor the Master Lease itself refer to any outside documentation to further explain or otherwise modify the term "fair market value." Accordingly, the Court concludes that the FMV Addendum's term "fair market value" presumptively must stand alone without consideration of any extrinsic evidence as defining the parties' obligations. *See also* 810 ILCS 5/2A-202 (providing that terms in an integrated agreement "may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement. . . .").

b.      Possible Ambiguity In The Agreement

The Court's finding that the Agreement is integrated does not necessarily end the inquiry. If a contract is ambiguous concerning a disputed issue, "[n]otwithstanding the parol evidence rule, extrinsic evidence can be admitted to discover the parties' genuine intent" concerning the ambiguity. *Brooklyn Bagel Boys*, 212 F.3d at 380 (citations omitted). Nevertheless, "[e]xtrinsic evidence cannot be used to create a conflict completely apart from the contract itself." *Id.* (citation and internal quotation marks omitted). Moreover, as to ambiguity, "there must be either contractual language on which to hang the label of ambiguous or some yawning void . . . that cries out for an implied term." *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 608 (7th. Cir.

17

1993) (also adding that "[e]xtrinsic evidence should not be used to add terms to a contract that is plausibly complete without them") (citations omitted).

Whether a contract is ambiguous is a question of law. *See Berryman Transfer & Storage Co., Inc. v. New Prime, Inc.*, 802 N.E.2d 1285, 1287 (Ill. App. 2004). "A contract is ambiguous when its language is susceptible to more than one meaning . . . or is obscure in meaning through indefiniteness of expression." *Id.* (citation, internal quotations, and alteration omitted). However, "language is not rendered ambiguous simply because the parties do not agree upon its meaning." *W.R. Lathom Tool & Mach. Co., Inc. v. Mut. Leasing Assocs., Inc.*, 435 N.E.2d 510, 512 (Ill. App. 1982) (citation and alteration omitted).

As summarized earlier, IA argues that a question of fact exists concerning whether the unsigned facsimile "properly provides evidence on an uncertain and undefined term in the [A]greement." (Def. Mem. at 9.) Defendant argues that the term "fair market value" in the Agreement is ambiguous as to whether it includes a 20% cap in relation to original purchase price, and that the Side Letter should be understood to cap the fair market value term in the FMV Addendum at 20%. (Def. Mem. at 9-12.)

The Court respectfully disagrees that the term "fair market value" is ambiguous—at least with respect to the only issue in dispute between the parties—*i.e.*, whether "fair market value" is capped at 20% of the original purchase price of equipment, or whether the "fair market value" can go above 20%, as it frequently did during the course of the parties' actual dealings. According to *Black's Law Dictionary*, "fair market value" is "[t]he price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction; the point at which supply and demand intersect." *Black's Law Dictionary* 1587 (8th ed. 2004). This

meaning is also strongly reflected in Illinois caselaw—*see, e.g., Walsh v. Prop. Tax Appeal Bd.*, 692 N.E.2d 260, 261 (Ill. 1998) (stating that "fair market value" is "the amount for which a property can be sold in the due course of business and trade, not under duress, between a willing buyer and a willing seller") (internal quotation marks and citation omitted); *W.R. Lathom Tool & Mach. Co.*, 435 N.E.2d at 512 ("Fair market value means the 'price at which a which a willing seller and a willing buyer will trade'") (quoting *Black's Law Dictionary* 716 (4th ed. 1968)). The Court similarly finds "fair market value" as used in the FMV Addendum to be facially unambiguous—at least as to the question in dispute between the parties: whether "Fair Market Value" contained a numerical hard cap of 20% of original purchase price. *Accord, e.g., Krilich v. Am. Nat'l Bank & Trust Co. of Chicago*, 778 N.E.2d 1153, 1164 (Ill. App. 2002) ("A court must construe the meaning of a contract by examining the language and may not interpret the contract in a way contrary to the plain and obvious meaning of its terms. Unless the contract clearly defines its terms, the court must give the contractual language its common and generally accepted meaning."); *Dribeck Importers, Inc. v. G. Heileman Brewing Co., Inc.*, 883 F.2d 569, 573-74 (7th Cir. 1989) (under Illinois law, "[t]he terms of a contract should be given their natural and ordinary meaning") (internal quotation and citation omitted).[6]

---

[6] Those familiar with valuation fights—for example, in the context of bankruptcy reorganizations, where the enterprise value of a debtor-corporation will often have a significant impact on the recoveries of the respective creditor constituencies—will note that there are other potentially contentious issues that can go into the determination of "fair market value." For example, determining the proper enterprise value in such a context may involve looks at any number of potential valuation methods such as a Discounted Cash Flow (DCF) analysis, an analysis of comparable corporate sales and acquisitions, or analysis using the price-earnings ratios of the stock of allegedly comparable publicly traded companies. Similarly, valuation of equipment sometimes raises issues such as whether the equipment should be valued as it is worth to the party that presently has possession of the equipment (so called "in place value")—which methodology will tend to produce a higher value for the equipment, because of the costs that

In this regard, the Court also rejects Defendant's assertion that the Side Letter merely "supplements" the term "Fair Market Value." (Def. Mem. at 11.) First, the Court notes that the integrated lease Agreement specifically provided that "NO ORAL OR OTHER WRITTEN AGREEMENTS, REPRESENTATIONS, OR PROMISES SHALL BE RELIED UPON, OR BINDING ON, THE PARTIES UNLESS MADE A PART OF THIS LEASE BY A WRITTEN MODIFICATION SIGNED BY AN AUTHORIZED SIGNER OF LESSEE AND LESSOR," (Pl. SF ¶ 24 (capitalization in original)), so Defendant's argument fails on that basis alone, as the Side Letter is not signed by anyone, much less by an authorized signer of Plaintiff. Second, and independently, Defendant's premise—that the Side Letter does not "conflict with a provision of the Master Lease," but merely "provides a range of fair market value" (Def. Mem. at 11), is unavailing. As a matter of actual practice in this case (and economic theory as well), any 20% "cap" on fair market value (Def. Mem. 9) is a material variation from an arrangement that would otherwise let fair market value potentially rise above (or sink below) 20%—depending on considerations such as the nature of the equipment at issue, its current condition, and current market supply and demand concerning such used equipment. Defendant recognized as much in its counterclaim advanced in this case, in which Defendant asked the Court to declare "that the Master Lease and Addendum, as *modified by* the [Side] Letter, requires Defendant/Counterplaintiff to pay no more than 20%[,]" and where Defendant also specifically

---

would visit the current possessor if it needed to pull out the equipment and try to replace it—or instead should be valued as the equipment would be bought and sold in an open-market transaction. None of these nuances is implicated by the present case—where the issue in dispute is simply whether the term "fair market value" in the parties' agreements is capped at 20% of original purchase price (as Defendant contends) or whether there is no 20% cut-off (as Plaintiff contends and, as explained further below, the parties' course of dealing confirms).

20

asserts that the Side Letter "*prevails over* the language of the FMV Addendum." (D.E. 9 at 18; Def. Mem. at 12 (emphases added).)[7]

      c.    Defendants' Course Of Conduct Confirms That The Parties Did Not Incorporate The Side Letter Into The Master Lease Or Understand That There Was Any 20% Cap On Fair Market Value

Under the UCC, "[i]f a lease contract involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is relevant to determine the meaning of the lease agreement." 810 ILCS 5/2A-207(1). Consideration of the parties' course of conduct under the lease confirms that the parties did not incorporate the Side Letter into their Agreement or understand that there was any 20% cap on "fair market value."

With respect to the term's usage in the FMV Addendum, it is apparent that the parties envisioned some negotiation as to the mutually acceptable purchase price of equipment listed in the Equipment Schedules, should IA exercise its option to purchase the listed equipment at the

---

[7] In a perfunctory two-sentence footnote, Defendant alludes to an estoppel-like defense or argument. (Def. Mem. at 12 n.5.) This argument does not change the Court's conclusions. First, precedent teaches "arguments raised in passing in a footnote are waived." *United States Dep't of the Navy v. Fed. Labor Relations Auth.*, 975 F.2d 348, 352 n.1 (7th Cir. 1992) (citing *United States v. White*, 879 F.2d 1509, 1513 (7th Cir. 1989)); *accord, e.g., Standard Bank & Trust Co. v. Vill. of Orland Hills*, 891 F. Supp. 446, 449 n.2 (N.D. Ill. 1995). (In this regard, the Court also notes that Defendant never pleaded any such defense in its answer to Plaintiff's claims.) Second, and independently, the sole case Defendant cited, *Nelson v. Estes*, 507 N.E.2d 530 (Ill. App. 1987), did not contain an integration clause, and it appears to be inconsistent with the teaching and holdings of numerous Illinois and Seventh Circuit authorities in cases involving such integration clauses. *See, e.g., Air Safety, Inc.*, 706 N.E.2d at 885-86 (refusing to consider alleged oral and written evidence because of presence of integration clause); *Brooklyn Bagel Boys, Inc.*, 212 F.3d at 380-81 & n.7 (rejecting use of extrinsic evidence where contract had integration clause and terms were clear); *Talano v. Northwestern Med. Faculty Found., Inc.*, No. 97-C-7618, 2000 WL 1100337, at *6 (N.D. Ill. Aug. 4. 2000) (Nordberg, J.) (rejecting consideration of "side letter" when contract had integration clause).

end of its lease term. The parties negotiated to reach mutually acceptable valuation of the items

listed on Equipment Schedules No. 1 to 6. In addition, the Court notes that the parties engaged

in give-and-take negotiations regarding the terms of sale respecting items listed in Equipment

Schedules No. 1 to 6. The parties' negotiations are consistent with the "arm's-length"

transactions pursuant to the common definition of "fair market value," thereby reinforcing the

parties' intent and common understanding of the term as expressed in the context of the

Agreement.

In addition, with respect to the outcome of the initial end-of-lease-term sales, it is

undisputed that Defendant repeatedly agreed to pay amounts well in excess of 20% for

equipment related to various Schedules—specifically, 24.47%, 25.12%, and 26.05% for

Equipment Schedules No. 4, 5, and 6. (Pl. SF ¶ 47, 50, 59.) At no time did Defendant object that

any of these prices were above the supposed 20% hard cap that Defendant understood to be in

place, militating against a contractual interpretation that the cap was in effect. *See* 810 ILCS

5/2A-207(1); *see also Chicago & N.W. Ry. Co. v. Peoria & Pekin Union Ry.*, 360 N.E.2d 404,

407 (Ill. App. 1977) (holding that even if a contract term is ambiguous, "there is no more

convincing evidence of what the parties intended (by a contract) than to see what they did in

carrying out its provisions.") (internal quotation marks and citation omitted).

Defendant contends that the fact it paid more than 20% without objection for Schedules

No. 4, 5, and 6, should be ignored (*see* Def. Mem. at 10) because Defendant agreed to an average

purchase price of 16.7% for the first three Equipment Schedules (Def. SAF ¶ 44; Pl. Reply Ex.

E.), so "the cumulative value of Schedules 1 through 5 remained under 20%." (Def. Mem. at

10.) Defendant also contends that, in any event, the evidence is not germane because

"McClelland was trying to keep the relationship between the parties on a positive note, and the values were fairly close, so he did not make an issue of it." (*Id.*)

This proposed reason for discounting the probative force of Defendant's agreement to pay more than 20% seems inconsistent with 810 ILCS 5/2A-207(1), given that Defendant repeatedly made the 20%-plus deals without objection or even any mention of the Side Letter. *See generally Mathews v. Sears Pension Plan*, 144 F.3d 461, 467-68 (7th Cir. 1998) (rejecting use of interested party's subjective testimony to attempt to explain apparent clear meaning of contract, but allowing objective evidence such as parties' course of dealing). Defendant's proposed approach to the course-of-dealing and failure-to-object evidence (*i.e.*, that its purchases for more than 20% are not probative because Defendant was viewing purchases on an aggregated basis for the equipment relating to Schedules No. 1-5), also seems inconsistent with Defendant's subsequent refusal to pay more than 20% for the equipment relating to Schedule No. 7 *or any subsequent equipment schedule*. That casts further doubt on any notion that Defendant's repeated failure to object to sales above 20% is not relevant and damaging to Defendant's position.

However, even if the Court were to accept all of Defendant's contentions, and to ignore what appears to be the import of the aforementioned evidence concerning the parties' course of dealing, Defendant has no explanation for the aspect of the parties' course of dealing in which *Defendant* repeatedly proposed purchase prices for equipment that were above 20% of the original purchase prices of such equipment. Specifically, when Defendant was negotiating for purchase of the equipment relating to Schedule No. 5, McClelland, on behalf of Defendant, asserted in writing that, in Defendant's view, the "Total Estimated Value" or "Estimated FMV"

23

(which Defendant does not deny was an abbreviation for "F[air] M[arket] V[alue]") of equipment under that schedule was $34,853.22—or about 24.22% of the original purchase price. (Pl. SF ¶ 48.)[8]

Similarly, when the parties were negotiating for a purchase price concerning the equipment related to Schedule No. 6 at the end of that lease term, Defendant, through McClellan, again proposed purchasing the equipment for more than 20%. Specifically, in June 2002, McClellan offered to purchase the equipment for a "buy-out amount" of 20.8% of the original purchase price without ever referencing the Side Letter. (Pl. SF ¶ 52.)

These actions by Defendant followed on the heels of negotiations for the purchase of equipment relating to Schedule No. 4, where Defendant, through McClelland, stated that, "based on [his] calculations, a reasonable price [for the equipment listed in Equipment Schedule No. 4] would appear to be $37,348.44," an amount constituting at least 22.36% of the equipment's original purchase price. (*Id.* ¶ 45.) In support of this 22.36% offer, McClelland sent Plaintiff a spreadsheet containing his calculations and labeling his proposed figures as "Total Estimated Value" and "Estimated FMV."[9] (Pl. Ex. 36 at FAEF 10049-50.) This evidence reinforces the

---

[8] Following negotiations with Tracy Sherwood, Plaintiff's representative, Defendant agreed to purchase the Equipment Schedule No. 5 items for $36,156.25, or 25.12% of the original purchase price. (Pl. SF ¶ 50.)

[9] Defendant appears to deny that these figures, which appeared in writing concerning "Total Estimated Value" and "Estimated FMV," constituted fair market value quotes. (*See* Pl. SF ¶ 45; Def. Resp. to Pl. SF ¶ 45.) Defendant's citations do not properly deny Plaintiff's assertion that the 22.36% written quote for "Estimated FMV" was an estimate of Fair Market Value offered by Defendant. (*See* Def. Ex. D (McClelland Dep.) at 145:17-149:24.) Seventh Circuit precedent teaches that a non-movant to a summary judgment motion cannot simply "deny" appropriately supported factual assertions without relying on admissible record evidence to legitimately identify a disputed issue of material fact. *See, e.g., Liu v. T&H Mach., Inc.*, 191 F.3d 790, 796 (7th Cir. 1999); *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922-24 (7th Cir.

24

evidentiary value of Defendant's quotation of a price in excess of 24% as the fair market value of the equipment relating to Schedule No. 5, and of Defendant's quotation of a "buy-out amount" of 20.8% of the original purchase price for equipment relating to Schedule No. 6.[10]

Therefore, the parties' course of dealing does not support any notion that even Defendant understood that there was a 20% cap on fair market value. Even if one were to set aside the fact that Defendant repeatedly paid more than 20% for equipment without objecting or even mentioning the Side Letter, Defendant's proffered assessments of the fair market value for equipment relating to Schedules No. 4, 5, and 6 is consistent with the common understanding of "fair market value" as not having any artificial price cap and is inconsistent with Defendant's argument that the parties agreed to a 20% cap. *See, e.g, Brooklyn Bagel Co.*, 212 F.3d at 381 n.7 (finding a party's extrinsic evidence to be inconsistent with the contract's unambiguous terms); *see also Home Ins. Co. v. Chicago & Northwestern Trans. Co.*, 56 F.3d 763, 769 (7th Cir. 1995) (teaching that if term of lease is clear on its face, court cannot admit subjective evidence of alleged ambiguity such as interested party's testimony, but that court may look to objective evidence such as custom or usage of the trade); *Mathews*, 144 F.3d at 468 (court may, if language is clear, look to objective extrinsic evidence to see if parties actually intended meaning different

---

1994). Although not material to the Court's disposition of the motions at issue—or even its assessment of whether the parties' course of conduct supports any notion that the parties' agreement was understood by Defendant to cap Fair Market Value at no more than 20% (the course-of-conduct evidence does not support any such notion)—the Court finds Defendant's denial concerning Plaintiff's SF ¶ 45 to be improper under applicable precedent and the record of the case.

[10] Following further negotiations with Sherwood, McClelland agreed to purchase the items in Equipment Schedule No. 4 for $40,875.05, or 24.47% of the original purchase price. (Pl. SF ¶ 47.)

from apparently clear one, such as "course of dealing" evidence and fact that one party did not

object to other party's allegedly wrongful practice); *Air Line Pilots Ass'n, Int'l v. Midwest*

*Express Airlines, Inc.*, 279 F.3d 553, 556 (7th Cir. 2002) (noting that the party seeking to

challenge the literal meaning of a contract "must present *objective* evidence, not just his say-so,

that the contract does not mean what it says") (emphasis in original; citation omitted).[11]

      d.    The Side Letter Was Not Incorporated Into The FMV Addendum And Agreement.

At times, Defendant appears to contend that the Side Letter was incorporated into the

FMV Addendum, and thus it became a part of the Agreement itself. (Def. Mem. at 10, 12.)

Defendant's incorporation argument fails because of the Agreement's integration clause and the

parol evidence rule, as explained above. In addition, Illinois law requires that "[t]he contract

must show an intent to incorporate the other document and make it part of the contract itself."

*Rosenblum*, 299 F.3d at 664 (collecting cases). The incorporation must be clear and specific

from the contract itself. *See id.* ("When determining under Illinois law whether something is

incorporated into a contract, we limit our inquiry to the four corners of the contract.") (citation

omitted); *accord Atl. Mutual Ins. Co. v. Metron Eng'g & Constr. Co.*, 83 F.3d 897, 901-02 (7th

Cir. 1996).

Neither the Master Lease nor the FMV Addendum mentions the Sommers Letter at all, let

alone evinces a clear intent by the parties to incorporate the letter or its terms. The mention of

---

[11] Cases such as *Air Line Pilots Ass'n*, 279 F.3d at 556, and *Home Insurance Co.*, 56 F.3d at 769, reinforce the impropriety of looking at much of Defendant's proffered evidence of alleged ambiguity, which consists of oral testimony from an interested party made in the course of litigation. *See, e.g.*, Def. Mem. at 10 ("To McClellan's understanding, the . . . [Side Letter] was incorporated into and 'synonymous' with the Master Lease and FMV Addendum.").

"end of term option" in the Sommers Letter does not, contrary to IA's contention, show any intent to incorporate, which at any rate would have to be expressed in the four corners of the Agreement itself. *See id.* Defendant's principal evidence in support of its integration argument is subjective testimony of its own witness (*see* Def. Mem. at 10), and this proffered evidence is insufficient. *Id.* (quoting *Atl. Mut. Ins. Co. v. Metron Eng'g & Constr. Co.*, 83 F.3d 897, 901 (7th Cir. 1996)).

### e. Agency

Both parties also touch in passing in their briefs on agency issues with respect to Sommers, the assumed sender of the unsigned facsimile. As explained at length above, this unsigned facsimile is not part of the parties' fully integrated Agreement. In any event, to the extent agency concepts are still relevant, they do not change the result in the case.

First, it is not disputed that Sommers, a senior account executive, did not have actual authority to sign master leases, equipment schedules, or related lease documents on behalf of Plaintiff. (Pl. SF ¶ 58.) Defendant also suggests that Sommers had apparent authority to so contract, but Defendant's arguments are unavailing. Under Illinois law, apparent authority in a putative agent only can be created by acts of the principal, not the putative agent. *See, e.g., Onix Credit Alliance, Inc. v. Taylor Mach. Works, Inc.*, 125 F.3d 468, 474 n.1 (7th Cir. 1997) (citation omitted); *Mateyka v. Schroeder*, 504 N.E.2d 1289, 1295 (Ill. App. 1987). As a result, most of the evidence Defendant proffers concerning agency issues—namely, alleged acts and statements of Sommers (*see* Def. Mem. at 14-15)—is not germane. Defendant also refers to the fact that Sommers produced and signed the initial non-binding proposal concerning the parties' Agreement, but that is of no assistance to Defendant, given that the non-bonding proposal

27

specifically stated, in capital letters, that "THIS LETTER IS NOT, AND IS NOT TO BE

CONSTRUED AS, A COMMITMENT BY THE LESSOR TO ENTER INTO THE PROPOSED

LEASE TRANSACTION" and also expressly stated that Plaintiff would not be obligated until

"all requisite approvals by Lessor's management" were obtained. (Def. SAF ¶ 5; Pl. Ex. 8

(capitalization in original).) Therefore, the fact that Sommers sent the non-binding proposal, and

made an alleged change to it concerning a deposit issue, does not constitute evidence that

Plaintiff created the appearance that Sommers had authority to enter into a binding lease contract

on Plaintiff's behalf. The Court thus respectfully rejects Defendant's suggestion that "there is an

issue of material fact as to whether Sommers had apparent authority" (Def. Mem. at 15) to alter

the parties' contractual arrangement via the Side Letter.

> f.    Defendant's Valuation Evidence

Finally, it bears mention that Defendant places great stock in what Richard Wiorek, its

valuation "expert," proposes with respect to the fair market value of the items listed in

Equipment Schedule No. 7. (Def. Mem. at 7-8.) The Court notes, however, that Mr. Wiorek's

proposed valuation results from methodologies that often appear to be no more exacting than the

methods Defendant deprecates Ms. Sherwood for using.

For example, Mr. Wiorek admitted valuing computer equipment by "[doing] the research,

[getting] a general idea" of value by checking web site "listings of used computer equipment"

(Pl. Reply Ex. D at 78-79), but he could not identify the data in his work file that he relied on in

reaching his conclusions. (*Id.* at 79.) Mr. Wiorek also testified that he employed an appraisal

method known as the "sales comparison approach" (*id.* at 93), in which the "appraiser derives a

value indication by comparing the personal property being appraised to similar assets that have

been sold recently. . . ." (*Id.* at 95.) However, Mr. Wiorek's appraisal report admittedly does not contain any of the similar assets he used to complete his appraisal for Equipment Schedule No. 7. (*Id.*)

Mr. Wiorek's remaining methods for other portions of his appraisal also appear somewhat informal. Mr. Wiorek did not, for example, have conversations with equipment manufacturers, manufacturers' representatives, or even with used machinery or equipment dealers. (*Id.* at 101-02.). Mr. Wiorek instead "relied [to] some extent on what a dealer told another appraiser in connection with another appraisal[]" and on conversations with "auctioneers and liquidators . . . down the hall" at his own company. (*Id.* at 102.)

In this regard, Mr. Wiorek's methods do not appear substantially more rigorous or exacting than Ms. Sherwood's, which entailed online research, "ballparking," and "approximation" based on "plain knowledge." (Def. Mem. at 5-6.) And while Defendant takes a broad swipe at Ms. Sherwood for not offering "a single piece of documentation to support the price she offered to IA at the end of Schedule 7" (*id.* at 5), Mr. Wiorek himself acknowledges that "the data information and documentation necessary to support [his] analyses, opinions and conclusions[] . . . is not contained within [his] work file. . . ." (Def. Reply Ex. D at 110-11.)

Plaintiff has pinpointed a number of other flaws that appear to cast doubt on the utility of Mr. Wiorek's valuation determination. For example, Mr. Wiorek's appraisal reflected his estimates as of April 8, 2003, not the end of the lease term for Equipment Schedule No. 7, which was December 31, 2002. (*Id.*) In addition, Plaintiff notes that Mr. Wiorek admittedly did not appraise any of the software contained in Schedule No. 7, even though he believed it had value and even though Plaintiff had paid Defendant a substantial sum for it in 1998. (*Id.*)

The Court need not decide whether these issues would disqualify Mr. Wiorek from offering evidence as an "expert" pursuant to Fed. R. Civ. P. 26, or whether they render Wiorek's testimony inadmissible under Rule 56 (Plaintiff contends that both propositions are true), given the Court's other rulings in the case. (Pl. Reply Mem. at 14.) The Court notes, however, that many of Plaintiff's specific criticisms appear to have at least some merit, and at a minimum indicate that Wiorek's valuation approach is not different in kind from that of Ms. Sherwood.

For all of these reasons, the Court rejects Defendant's contention that summary judgment is impermissible because there are material disputed facts concerning whether the Side Letter caps "fair market value" at 20% of the original purchase price for equipment in Schedule No. 7.

2.      Breach Of The Contract

Defendant also argues that summary judgment cannot be given because there is a material disputed fact concerning whether Plaintiff actually offered Defendant the opportunity to buy the equipment listed in Schedule No. 7 at a "fair market value." (Def. Mem. at 7.) In making this argument, Defendant also deprecates the skills and training of Plaintiff's employee who was quoting "fair market values" for the various equipment schedules (*id.* at 5-8), and Defendant asserts that so long as there is a factual dispute concerning whether Plaintiff's offered price was in fact the "fair market value" there is no way to resolve the case short of trial. (*Id.* at 8.) As explained below, this argument fails.

Under the Agreement, Defendant had three options at the end of the presumptive lease term for any equipment schedule. Defendant could either: (a) return the equipment; (b) pay rent for the equipment at issue at a contractually agreed extended-term rate, which became effective after the presumptive expiration of the lease term; or (c) purchase the equipment at fair market

value. (Pl. Ex. 5, Tab 1, at IA 00003 ¶ 20; Tab 2 at IA 00005.) Significantly, in the Master

Lease, Defendant expressly agreed on the signature page to "WAIVE . . . THE RIGHT TO

SPECIFIC PERFORMANCE." (*Id.*, Tab 1 at IA 00004 (capitalization in original).)[12] By

retaining possession of the equipment under Schedule No. 7 (while also refusing to pay the

contractually agreed extended-term rent), Defendant in effect and substance forced specific

performance of the Side Letter. That is expressly proscribed, however—if Defendant believed

that Plaintiff had breached any contractual duty to quote it a "fair market offer" for the equipment

covered by Schedule No. 7, Defendant's remedy was to return the equipment and to sue for

damages.

Defendant appears to contend that this arrangement somehow is unthinkable, and would

require Defendant to suffer the "untenable position where its options were to: (1) purchase the

equipment at an unreasonable price; (2) renew the lease and pay" some $90,000 in extended-term

rent, which Defendant believes is too high; or (3) "forfeit the equipment that it was currently

using." (Def. Mem. at 8.) Defendant's objection is without foundation. There is nothing

unreasonable (and Defendant certainly cites no authority to suggest that it is *unlawful*) about the

arrangement Defendant identifies. As to option (2), *Defendant* contractually agreed to the

---

[12] In its Memorandum, Defendant contends in passing in a footnote that it "disputes" Plaintiff's claim that Defendant waived the right to specific performance. (Def. Mem. at 9 n.1.) As discussed *supra* in footnote 7, precedent teaches that this undeveloped footnote assertion is insufficient for Defendant to argue that it has not waived any right to specific performance. *See, e.g.*, *United States Dep't of the Navy v. Fed. Labor Relations Auth.*, 975 F.2d 348, 352 n.1 (7th Cir. 1992) ("[A]rguments raised in passing in a footnote are waived.") (citation omitted). In addition, and independently, Defendant offers no reason to think the waiver of one (and only one) potential contractual remedy, by a corporate entity that has ready access to counsel, is somehow illicit, particularly in the context of a multi-item contract in which the parties could variously bargain and trade to their advantage concerning any number of items.

extended-term rent rates, so Defendant is ill-positioned, as a large corporation with ready access to business and legal experts, to seek judicial relief from the rental rates to which it agreed. As to option (3), Defendant offers nothing to suggest that the fact that it might need to return equipment if it could not find a mutually acceptable purchase price is somehow unreasonable or unlawful. And as for option (1), Defendant has an option if it believes that Plaintiff is breaching any contractual duty to offer the equipment at fair market value—Defendant could sue for damages. Nothing in this arrangement between two corporations, operating at arm's length, appears unlawful, and it certainly does not, as Defendant contends, require Defendant "to purchase the equipment at *whatever* number FAEF quoted to IA." (Def. Mem. at 8 (emphasis in original).)

Precedent teaches that, under Illinois law, courts should not twist the clear meaning of a contract merely to reach what a court might believe is "a more equitable result." *Home Ins. Co.*, 56 F.3d at 769 (collecting numerous Illinois and Seventh Circuit cases). As a result, Defendant offers no reason to question the lawfulness of the options and arrangement the parties—again, two large corporations—have reached in their Agreement.

That said, caselaw also teaches that courts can be skeptical of the apparent meaning of a contract where it leads to absurd results. *See AM Int'l, Inc. v. Graphic Mgmt. Assocs., Inc.*, 44 F.3d 572, 577 (7th Cir. 1995) (collecting cases). In this regard, the Court notes that there is nothing absurd about the three-option arrangement that the parties reached in the Agreement. Under the regime set forth in the Agreement, both parties have strong incentives to be reasonable concerning the assessment of "fair market value" for various assemblages of equipment—or at least reasonable enough to find common ground on "fair market value" without having to litigate

the issue and endure excessive valuation and litigation expenses. Plaintiff has a substantial incentive to be reasonable because otherwise it will be stuck with a substantial cache of used equipment, which it then will be required to sell to another putative purchaser, which purchaser Plaintiff must identify, negotiate with, and provide the equipment. All of those efforts cost time and money, so Plaintiff has meaningful incentives to take a reasonable bargaining position concerning any potential end-of-term sale with a current possessor of equipment like Defendant. Defendant also operates under substantial incentives to be reasonable: if Defendant cannot reach a deal concerning the purchase price, it will need to incur the expenses of locating and returning the equipment, and of negotiating to buy or lease similar equipment from another vendor, all of which activities again will cost time and money. Under this regime, meaningful forces push both sides to the middle of the bargaining table, which is a result generally supported (and certainly not forbidden) in the law. *See generally Dawson v. Pastrick*, 600 F.2d 70, 75 (7th Cir. 1979) ("It is a well settled principle that the law generally encourages settlements . . . .") (citation omitted); *Bano v. Union Carbine Corp.*, 273 F.3d 120, 129 (2d Cir. 2001) ("[I]t is axiomatic that the law encourages settlement of disputes.") (collecting cases).

In addition, the alternative arrangement proposed by Defendant—where Plaintiff never could enforce its right to return of the equipment unless and until it indisputably established in a court of law that Plaintiff had offered the "fair market value" as a sale price—would invite substantial abuse by putative defendant/lessees. Under such a regime, the Plaintiff would face a substantial bargaining disadvantage: unless it quoted someone in Defendant's position a price so low that the Defendant could not find a putative valuation witness anywhere (including a paid expert) to quote a lower price, then Defendant could always claim that a triable issue existed as

33

to whether "fair market value" had been offered such that Plaintiff would take nothing until it prevailed at trial. (The situation is actually worse than that for Plaintiff, as it also would need to factor in the substantial litigation costs attendant to going to trial, which costs would include attorneys and likely a valuation expert too.) In such a regime, Plaintiff also would be subject to a deteriorating position vis-a-vis security for any debts that would accruing; while Plaintiff likely would have liens on the equipment at issue, that equipment would naturally be depreciating in value, so Plaintiff's security position would likely be eroding concerning any rents that Plaintiff might establish were overdue, even if it chose to litigate in court. Plaintiff naturally might be skeptical of such a regime and want (as it did here) to bargain for a regime in which it could not be so readily manipulated.

Before moving on, the Court notes that Defendant spends considerable time and attention criticizing the academic training and methodologies used by Plaintiff's employee, Tracy Sherwood, who quoted "fair market values" to Defendant. If Defendant actually takes these alleged shortcomings seriously, it had the right to litigate whether Ms. Sherwood's alleged deficiencies were such that Defendant was not receiving "fair market value" quotes in the context of a damages suit that could have been filed so long as Defendant returned the equipment at issue. It bears mention, though, that much of Defendant's attack seems misplaced: the law does not require that every business or person trying to bargain for the sale of a good or service employ a valuation expert who could qualify as a hired expert witness in a corporate takeover valuation dispute.[13] Ms. Sherwood may not have extensive formal academic business training

---

[13] The Court takes no position on whether Ms. Sherwood would qualify as an expert witness if any issues needed to be litigated concerning her valuations or price quotations.

(although she is studying for an MBA), but, perhaps more important, she had substantial real world experience in her position quoting prices and consummating sales on behalf of Plaintiff. Her methods of quoting prices may have been somewhat informal, but her use of the internet to find comparable price quotes reflects access to market data that might well have been impossible thirty, fifty, or certainly one hundred years ago—particularly in less urban parts of the country. Also, in many respects any informality makes good practical sense: when parties are haggling over ten thousand dollar gaps in a bid-ask scenario, they both might well benefit from trying to close that gap informally without spending too much time and money on valuation efforts.

Nonetheless, Defendant was free to raise any and all objections it wanted to Ms. Sherwood and to Plaintiff's price quotes. But, under the arrangement established by the parties, Defendant needed to raise those objections in the context of a damages suit. What Defendant was *not* allowed to do was to stonewall as it did—*i.e.*, to refuse to return the equipment (while sticking Plaintiff with paying taxes for it), to refuse to pay extended-term rent at the contractually agreed rate, and to refuse to bargain to common ground concerning a "fair market value" payment for the equipment, all at the same time. Defendant's conduct violated the Agreement.

In sum, the Court finds that the parties' Agreement is unambiguous concerning whether "fair market value" was capped at 20% of the original purchase price for the relevant equipment. It was not. This result is confirmed by the parties' course of dealing and Defendant's own repeated offers to pay more than 20% for multiple equipment schedules. Further, as explained above, Defendant may not take refuge in its argument that it disputes whether the price Plaintiff offered for the equipment was actually a "fair market value" for the items. Defendant had various options at the end of the lease, but one of them was not retaining the equipment and

35

refusing to pay extended-term rent for it.[14]

### 3.   Plaintiff's Conversion Claim

The Court next turns to FAEF's conversion claim. The elements of conversion under
Illinois law are: (1) the defendant's unauthorized or wrongful assumption of control, dominion,
or ownership over the plaintiff's personal property; (2) the plaintiff's right in the property; (3) the
plaintiff's right to immediate possession of the property, absolutely and unconditionally; and (4)
the plaintiff's demand for possession of the property. Defendant is in breach of the Agreement
by failing to extend the lease or return the equipment, so its retention of the items listed on
Equipment Schedule No. 7 is "unauthorized or wrongful." (In this regard, it bears repeating that
in the Master Lease, Defendant expressly waived any right to specific performance of the
contract (Pl. Ex. 5, Tab 1 at IA 0004), so Defendant was required to return the equipment if it did
not want to rent the equipment under the extended lease terms, assuming the parties could not
reach a mutual agreement on "fair market value.") Furthermore, Plaintiff owns the items on
Equipment Schedule No. 7, has the right to immediate and unconditional possession of the items
due to the termination of the lease term, and Plaintiff has demanded the return of the items. (Pl.
SF ¶ 66.) Accordingly, the Court finds that Plaintiff has shown that the elements of its claim for
conversion are satisfied.

## V.   **CONCLUSION**

The Court finds as a matter of law that the parties' Agreement is complete, integrated,
and unambiguous. In addition, the Court finds that IA has breached the Agreement and is liable

---

[14] Because Defendant's counterclaim seeks a declaratory judgment contrary to the
Court's interpretation of the Agreement, Defendant's counterclaim necessarily fails.
Accordingly, the Court dismisses Defendant's counterclaim.

to FAEF both for breach of contract and for conversion. Accordingly, the Court grants FAEF's motion for summary judgment on counts I and III of its complaint. IA's counterclaim seeking declaratory judgment is dismissed.

The parties are directed to attempt consensually to ascertain what damages are appropriate under this Opinion given the passage of time since IA stopped making any rental payments—throughout which period of time IA has retained possession of the equipment. The parties are also directed to attempt to resolve the precise amount of any additional damages that are due—such as accrued tax payments and attorneys fees provided for by the Agreement. If the parties are not able consensually to determine what amounts are due consistent with this Opinion, the Court will have any appropriate hearings necessary to resolve such issues.

So ordered.

Mark Filip
United States District Judge
Northern District of Illinois

Date: 8-30-04